IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs November 12, 2015


**JASON CURTIS JOHNSON v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Wilson County**
**No. 02-0928     John D. Wootten, Jr., Judge**

_____

**No. M2015-00258-CCA-R3-PC – Filed December 30, 2015**
_____


Jason Curtis Johnson ("the Petitioner") was convicted of one count of first degree premeditated murder and one count of second degree murder for the shooting death of Christy Waller and her unborn child. He was sentenced to life plus twenty-five years. In this post-conviction proceeding, the Petitioner argues that he received ineffective assistance of counsel for the following reasons: (1) trial counsel's "inadequate trial preparation and performance"; (2) trial counsel's "errors concerning [the] Petitioner's Sixth Amendment right to a fair and impartial jury"; (3) trial counsel's failure to have evidence tested; (4) "trial errors"; (5) trial counsel's failure to object to a State's witness commenting on the Petitioner's right to testify; (6) trial counsel's failure to object to "prosecutorial misconduct"; (7) trial counsel's failure to present proof as to the viability of the fetus and appellate counsel's failure to present the issue on appeal; (8) appellate counsel's failure to "fully raise the issue of sufficiency of the evidence"; and (9) trial counsel's failure to put on any evidence of mitigating factors during the sentencing hearing. Additionally, the Petitioner claims that (1) his Fifth Amendment rights were violated because his Miranda waivers and confessions were not voluntary; (2) his Sixth Amendment right to counsel was violated because that right had attached before the police questioned the Petitioner; and (3) his "Sixth Amendment right to a jury trial was violated by the use of Tennessee's unconstitutional sentencing scheme." Following a hearing, the post-conviction court denied relief. Upon review of the record and the applicable law, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the Court, in which NORMA MCGEE OGLE and CAMILLE R. MCMULLEN, JJ., joined.

A. Ensley Hagan, Jr., and Andrea Hagan, Lebanon, Tennessee, for the appellant, Jason Curtis Johnson.

Herbert H. Slatery III, Attorney General and Reporter; Clark B. Thornton, Senior Counsel; Tom P. Thompson, District Attorney General; and Howard Lee Chambers, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### Factual and Procedural Background

*Trial*

The Petitioner was charged with two counts of first degree premeditated murder for the death of Christy Waller and her unborn child.[1] At trial, the State presented proof that Mrs. Waller was shot twice in the head from a distance of six inches to two feet. The proof also showed that, at the time of the shooting, Mrs. Waller was either squatting or kneeling on the floor and had her arm held in front of her face.

The Petitioner made numerous statements to others admitting that he shot the victim, including four written statements to police. The Petitioner's written statements contradicted each other as to the details of who was with the Petitioner when he shot Mrs. Waller and how he disposed of the gun and the clothes he was wearing at the time of the shooting. However, the statements consistently said that the Petitioner came to Mrs. Waller's house, followed her into the bedroom, and shot her twice. The State asserted that the Petitioner's motive for shooting Mrs. Waller was the failure of Mr. Waller to pay a $900 drug debt.

Dr. John Gerber, an expert in forensic pathology, testified that Mrs. Waller's fetus was twenty-three to twenty-four weeks gestational age and weighed 500 grams. Based on that information, Dr. Gerber opined that the fetus was viable, meaning that it could survive outside the mother's body with the assistance of a ventilator and incubator. However, Dr. Gerber acknowledged that the fetus was "at the lower edge of viability." On cross-examination, Dr. Gerber qualified his testimony regarding viability, stating, "[I]t could have survived, it could not have survived. It depends. Five hundred grams is a very critical point." On redirect examination, Dr. Gerber maintained that his examination indicated that the fetus was viable at the time of the shooting.

---

[1] To assist in the resolution of this proceeding, we take judicial notice of the record from the Petitioner's direct appeal. See Tenn. R. App. P. 13(c); State v. Lawson, 291 S.W.3d 864, 869 (Tenn. 2009); State ex rel Wilkerson v. Bomar, 376 S.W.2d 451, 453 (Tenn. 1964).

The Petitioner was convicted of first degree premeditated murder for the death of Mrs. Waller and second degree murder for the death of Mrs. Waller's unborn child. Following a sentencing hearing, the trial court ordered consecutive sentences of life plus twenty-five years. This court affirmed the Petitioner's convictions and sentences on direct appeal. State v. Jason Curtis Johnson, M2003-03060-CCA-R3-CD, 2006 WL 407767, at *21 (Tenn. Crim. App. Feb. 17, 2006), perm. app. denied (Tenn. June 26, 2006).[2]

### Post-Conviction Proceedings

The Petitioner filed a timely Petition for Relief from Conviction or Sentence and a subsequent amended petition (collectively, "the Petition"). In the Petition, the Petitioner claimed that he received ineffective assistance of counsel and listed numerous alleged instances to support his claim. Additionally, the Petitioner averred that his Fifth Amendment rights were violated because his confessions were coerced; his Sixth Amendment right to counsel was violated because he was denied counsel during the police interrogation; comments made during the State's opening and closing arguments constituted prosecutorial misconduct and trial counsel was ineffective for failing to object to such comments;[3] and the Petitioner's Sixth Amendment right to a jury trial was violated "by the use of Tennessee's unconstitutional sentencing scheme."

At the post-conviction hearing, the court admitted into evidence the deposition transcript of Dr. Feng Li. In that deposition, Dr. Li stated that he was present during the autopsy of Mrs. Waller and her fetus. In preparation for the deposition, Dr. Li had reviewed the autopsy report, Dr. Gerber's testimony, and tables Dr. Li commonly used to determine the gestational age of a fetus.[4] Dr. Li concurred with Dr. Gerber's conclusion that Mrs. Waller's fetus was twenty-three to twenty-four weeks gestational age and weighed 500 grams. Dr. Li assumed that Dr. Gerber had relied on Mrs. Waller's clinical history when reaching his conclusion; however, Dr. Li did not know if Dr. Gerber relied on any of Mrs. Waller's medical records during the autopsy. Dr. Li explained that the most important factor for determining viability was the fetus's lungs. Dr. Gerber had noted that the lungs had three lobes on the right and two lobes on the left, which indicated to Dr. Li that the lungs were developing normally. Dr. Li stated that he could not determine whether the fetus was alive or dead at the time of Mrs. Waller's death just by

---

[2] A more detailed summary of the proof presented at trial can be found in this court's opinion from the Petitioner's direct appeal. In this opinion we will address the facts presented at trial as they are relevant to the Petitioner's claims for post-conviction relief.

[3] In the Petition, the Petitioner sets forth a free-standing claim alleging that he was denied due process by improper comments in the State's closing argument. He relegates to a footnote the claim that trial counsel was ineffective for failing to object to the allegedly improper argument.

[4] The tables are not included in the record on appeal.

examining the fetus. Dr. Li explained that, under the legal definition of viability, "any gestation age beyond [twenty-two] week[s] and above 500 grams is defined as viable."[5] However, Dr. Li explained that it was not possible to determine whether any one individual fetus was viable because there were too many variables. Dr. Li admitted that a fetus's viability might be affected if the mother used drugs such as cocaine, but he could not say "which direction it would affect." On cross-examination, Dr. Li agreed with Dr. Gerber's testimony that the fetus was "right at the edge, it could have survived, it could have not survived. It depends. 500 grams is a very critical point."

Appellate counsel testified that he did not recall raising on appeal the issues of the State's witness commenting on the Petitioner's right not to testify or the sufficiency of the evidence as to the viability of the fetus. Appellate counsel explained that he raised the issues that he thought were supported by the record and were raised in the motion for new trial. On cross-examination, appellate counsel noted that this court addressed the sufficiency of the evidence regarding the viability of the fetus on direct appeal and determined that there was sufficient evidence to support the Petitioner's conviction for second degree murder.

Lieutenant Detective Ricky Knight testified that he participated in the investigation of Mrs. Waller's death. Detective Knight also admitted that he was the half-brother of one of the witnesses in the case, Leah Mendoza. During the investigation, Detective Knight learned from his father that Ms. Mendoza wanted to talk to Detective Knight about the case. Detective Knight notified his supervisor, and his supervisor spoke with Ms. Mendoza. Detective Knight stated that he had not seen Ms. Mendoza's statement wherein she claimed that Detective Knight threatened to have her "locked up" if she did not cooperate with the police. Detective Knight denied making such threat. Detective Knight read a portion of Ms. Mendoza's testimony from the trial where she said, "Well, Friday they called my house and said that they was tired of playing games with me and if I didn't pick my subpoena up, they were going to lock me in jail until the court date. That's what my brother told my stepmother." Detective Knight denied threatening Ms. Mendoza by way of her stepmother.

During the Petitioner's interview, Detective Knight, along with another detective, transported the Petitioner to a location where the Petitioner claimed he had disposed of the murder weapon. There was a large rock at that location, and the Petitioner claimed that he had beaten the gun against the rock to destroy it and threw the gun into a field. Detective Knight recalled that there were "some scratches" on the rock but that they could not locate the weapon in the field. Detective Knight recalled that the Petitioner was behaving normally and appeared alert during the car ride. Apart from that interaction, Detective Knight did not have any other contact with the Petitioner.

---

[5] Dr. Li does not identify where he found this "legal definition" of viability.

Trial counsel testified that he was licensed to practice law a little over one year before the Petitioner's trial. Trial counsel had tried three or four jury trials prior to his representation of the Petitioner, but this case was the first time trial counsel had represented someone charged with first degree murder. The Petitioner was originally represented by the public defender's office, but the Petitioner's family retained trial counsel "four to six months prior to trial." Although trial counsel had been retained, the trial court ordered that the public defender remain on the case to sit as second chair during the trial. Trial counsel stated that he "absolutely" discussed the case with the public defender prior to trial. Trial counsel acknowledged that the Petitioner's trial was scheduled to take place on November 12-13, 2003. Trial counsel filed a substitution of counsel and made an oral motion for continuance on September 17, 2003, but the trial court denied the motion. Although trial counsel filed the agreed order for substitution of counsel two months before trial, he explained that he had been retained and was working on preparations for the case four to six months before trial and that there was a delay before he filed the agreed order for substitution of counsel. Trial counsel stated there was no particular reason for the delay.

Trial counsel explained that he did not file a motion for change of venue because there was not much media coverage of the offense after the initial news reports. Trial counsel admitted that he had represented a person named Kenton Ingle prior to taking the Petitioner's case. However, trial counsel did not recall a time when the public defender's office asked to interview Mr. Ingle in connection with the Petitioner's case.

Trial counsel testified that there were four African-Americans in a pool of thirty to forty potential jurors. One African-American juror was struck for cause because he was related to the Petitioner. Trial counsel used a preemptory strike to eliminate one of the African-American jurors, but he could not remember why he struck that juror.[6] The final twelve jurors included one African-American. However, it was later determined that that juror was either the aunt or cousin of the Petitioner.[7] Trial counsel stated that he did not move for a mistrial once he discovered that one of the jurors was related to the Petitioner.

Trial counsel recalled that the public defender's office had filed a motion seeking funds for a psychological evaluation of the Petitioner and that the trial court had signed an order allowing a psychological examination. Trial counsel did not recall speaking

---

[6] Initially, trial counsel thought that the State had exercised its preemptory strike to excuse one of the African-American jurors. However, after reviewing the challenge sheets, the post-conviction court noted that trial counsel was the person who struck the juror in question.

[7] There is no indication in the record as to when the parties learned that the juror was related to the Petitioner.

with the public defender about a psychological examination. Trial counsel stated that he did not use a psychological examination at trial.

Trial counsel attempted to contact every witness that was included on the State's witness list. Additionally, trial counsel was able to find other witnesses during his investigation. Trial counsel could not remember if he spoke with Paula Wheeler. Trial counsel noted that the Petitioner claimed that he was under the influence of drugs—specifically six to fourteen Xanax pills—when he turned himself in to the police for questioning. Trial counsel stated that there was a written statement to corroborate that allegation, but he could not remember if it was written by Ms. Wheeler. Trial counsel litigated the issue at the hearing on the motion to suppress. Trial counsel noted that he did not call the Petitioner to testify at the suppression hearing because the Petitioner did not want to testify and trial counsel thought it was prudent not to call the Petitioner. Trial counsel stated that the denial of the motion to suppress was "devastating." However, trial counsel proceeded to trial on the theory that the victim was killed by her husband, not the Petitioner.

Trial counsel stated that Mrs. Waller was going to receive inheritance money and her paycheck on the day she was killed. Trial counsel used this information as part of the defense strategy to suggest that Mr. Waller had committed the murder. Mr. Waller had "burned through" approximately $100,000 to feed his drug addiction, and trial counsel had identified at least three drug dealers to whom Mr. Waller owed money. Moreover, Mrs. Waller's family did not want Mr. Waller to have access to her inheritance money. Additionally, Mr. Waller had told police that he did not allow guns in his house, that he did not like guns, and that he did not touch them. However, a neighbor testified that, in the weeks prior to the killing, he heard guns being fired in the Waller backyard. Additionally, trial counsel called Mr. Waller's father to testify at trial that, a week or two prior to the murder, Mr. Waller had tried to sell his father a weapon that used the same cartridge that killed Mrs. Waller. Trial counsel explained that the "entire defense theory" was that Mr. Waller, not the Petitioner, killed Mrs. Waller.

Trial counsel spoke with Ms. Mendoza "at length" before trial. During cross-examination of Ms. Mendoza, trial counsel was able to bring out a number of inconsistencies between her testimony and her prior statements. Trial counsel also noted that Antonio Hardy had provided two statements to police; in the first he simply stated that the Petitioner was at Mr. Hardy's home on the day of the offense, but the second statement included more details about the Petitioner washing his hair, the presence of a gun, "and that kind of stuff." Trial counsel noted that the statements differed from each other. Trial counsel could not recall whether Mr. Hardy had an agreement with the State for his testimony. However, trial counsel stated that Mr. Hardy was threatened with losing his children and that Mr. Hardy "changed his story on cross that he had never seen

a gun." Trial counsel also cross-examined Damon Brock, but he could not recall whether he had questioned Mr. Brock about his inconsistent statements about whether he had seen the Petitioner on the day of the offense. Trial counsel recalled that Krissy Foster, Mr. Hardy's girlfriend, also testified inconsistently with her police statement. However, trial counsel did not think that he presented her contradictory statements to the jury.

Trial counsel stated that the clothing the Petitioner was alleged to have worn during the offense was found in a "disposal bin." There was blood on one item of clothing, but testing was unable to match the blood to a specific individual. Trial counsel did not recall presenting this evidence to the jury, but trial counsel also noted that one of the Petitioner's statements indicated that the Petitioner had burned the clothes he was wearing during the offense.

Trial counsel recalled that Tennessee Bureau of Investigations Special Agent Jason Locke made a comment during his testimony that the Petitioner would have an opportunity to take the stand and testify. Trial counsel explained that he did not object to Agent Locke's comment or ask for a curative instruction because, at the time the comment was made, trial counsel believed the Petitioner was going to testify. According to trial counsel, the Petitioner was going to testify that he had an eighth-grade education and that he did not make the statements to police freely and voluntarily. Trial counsel noted that the Petitioner's testimony was a crucial part of their defense theory. The Petitioner had told trial counsel that he intended to testify, and he did not indicate differently until the last day of trial. At that point, the Petitioner decided not to testify because "his mother had convinced him that if [trial counsel] put him on the stand that the [S]tate was going to cross him up," so he elected not to testify.

Trial counsel acknowledged that the prosecutor referred to a couple of people during closing argument who did not testify at the trial. Additionally, the prosecutor commented during closing that the victim was begging for her life. Trial counsel admitted that he did not object to these statements. He noted that the prosecutor's comment about the victim's begging for her life was consistent with the evidence of the bullet trajectory and that she was shot while she was on her knees with her arms in front of her face.

Trial counsel did not recall whether he obtained Mrs. Waller's medical records or if he asked Dr. Gerber whether he relied on Mrs. Waller's medical records when forming his opinion about the viability of the fetus. Trial counsel stated that "there was no way any doctor could conclusively testify beyond a reasonable doubt" that the fetus could have survived outside the mother's body. Trial counsel recalled that Dr. Gerber testified that the fetus would have been considered viable. Trial counsel did not object to this testimony, but during cross-examination, trial counsel got Dr. Gerber to admit that there was no way to determine conclusively whether the fetus was viable. Trial counsel

explained that he did not call a defense expert witness about viability because he did not think it was necessary.

Trial counsel stated that there were two unidentified hairs found on Mrs. Waller's body—one on her shirt and one in her hand. Those hairs came from a Caucasian individual and were consistent in length and color to Mr. Waller's hair. Trial counsel consciously elected not to have the hairs tested because there was also a possibility that they were Mrs. Waller's hairs. If the test results revealed that they belonged to Mrs. Waller, then trial counsel could not argue that the hairs had come from Mr. Waller. Trial counsel "thought the value of not knowing was far greater . . . than the probability or possibility that the hair could have actually belonged to the victim herself, and if that was the case, it just kind of undermined our entire theory all together."

Trial counsel stated that Agent Locke testified as to the existence of blood spatter at the scene. However, trial counsel did not believe Agent Locke gave any testimony about the trajectory of the bullet based on the blood spatter. If Agent Locke had given expert testimony of that sort, trial counsel would have objected.

The Petitioner was alleged to have borrowed a vehicle to travel to the Wallers' home on the day of the offense. Trial counsel believed the vehicle was tested and that nothing was found in the vehicle. However, trial counsel did not bring that fact to the jury's attention. As to mitigating factors at sentencing, trial counsel asked the court to consider the Petitioner's age and lack of criminal record.

On cross-examination, trial counsel explained that he did not seek a psychological evaluation of the Petitioner because trial counsel had not observed the Petitioner behave in a way that indicated a psychological evaluation may have been necessary. Additionally, in order for the defense theory to be successful, trial counsel acknowledged that the Petitioner would have had to take the stand and deny all the statements he made to police and other individuals.

Trial counsel could not recall why he struck one of the African-American members from the jury.

Paula Wheeler testified that the Petitioner was at her home on the day he turned himself in to the police. The Petitioner had come to see her son. While he was there, Ms. Wheeler observed the Petitioner take a "very large amount" of pills. Ms. Wheeler recognized the pills as looking "exactly" like the Hydrocodone pills that she had been prescribed for pain. Ms. Wheeler told the Petitioner to leave her home, and the Petitioner's father came to pick him up. Ms. Wheeler stated that no one from the defense team ever contacted her prior to trial. On cross-examination, Ms. Wheeler stated that she did not know at the time that the Petitioner was a drug dealer. Ms. Wheeler also

acknowledged that she knew the trial was going on but that she did not contact anyone to tell them about what she saw. Ms. Wheeler stated that she received a call from the Petitioner about six to eight months after he had been arrested and that the Petitioner informed her that he had told trial counsel that he had gone to Ms. Wheeler's house and taken pills prior to turning himself into the police.

The Petitioner testified that he went to Ms. Wheeler's house on the day that he turned himself into police. While there, his "partner" called him and told him to turn on the news.[8] The Petitioner did so and saw that he was on the news, so he called his father to come pick him up and take him to the police station to turn himself in. The Petitioner said that he gave Ms. Wheeler's name to the public defender and trial counsel because she had seen the Petitioner take "a handful of pills" before turning himself into the police. The Petitioner also stated that he asked the attorneys "for a drug test that was supposed to be on the record at the books at the county jail." The Petitioner stated that he went to the police station because the police wanted to talk to him and the Petitioner "had heard rumors that [the police] were planning on killing [the Petitioner] on sight and a whole bunch of foolishness." The Petitioner turned himself into the police because he wanted to clear his name.

The Petitioner stated that he wanted to testify at the suppression hearing and that trial counsel was aware that he wanted to testify. However, the Petitioner explained that he tried to give his version of the events but the judge would not allow him to testify. The Petitioner asserted that, at that point, trial counsel should have made an offer of proof of what the Petitioner would have testified to because he knew that the Petitioner wanted to testify.[9]

The Petitioner also told trial counsel to call Ms. Wheeler to testify at the suppression hearing because the Petitioner thought Ms. Wheeler's testimony was "very important" to the suppression of his statements because she could shed light on the Petitioner's state of mind when he turned himself into the police. The Petitioner asserted that he had taken a "mixture of Xanaxes and Hydrocodone"[10] before he turned himself into the police and that he had been taking pills, drinking, and smoking marijuana throughout the day. The Petitioner explained that this level of drug use was "[a] normal day" for him. He stated that he was already high when he took the pills at Ms. Wheeler's house and that he "felt a little bit better" after taking the pills. After taking the drugs, the

---

[8] On cross-examination, the Petitioner admitted that the "partner" who called to tell him that he was on the news was a partner in the Petitioner's drug business.

[9] The Petitioner did testify at the suppression hearing, but his testimony was limited to the issue of whether he objected to trial counsel representing him and potential witness, Kenton Ingle. The Petitioner stated that he had no objection.

[10] Later is his testimony, the Petitioner estimated that he had taken "probably about six or seven [pills], maybe eight and maybe three or four Lortabs and a couple of Xanaxes" at Ms. Wheeler's house.

Petitioner went directly from Ms. Wheeler's house to the sheriff's office. He did not eat anything before turning himself into the police.

Once the Petitioner arrived at the police station at 5:00 or 6:00 p.m., he was placed in "some kind of little offices or something" where he "waited and waited." The Petitioner recalled that, once Agent Locke arrived, the Petitioner asked, "I need a lawyer, don't I? I said, I want a lawyer. I said, don't I need a lawyer?" However, Agent Locke told him that "only a guilty man needs a lawyer." The Petitioner agreed to speak with Agent Locke because the Petitioner "ain't done nothing, got nothing to worry about." The Petitioner claimed that Agent Locke never read him the Miranda rights waiver and never told the Petitioner what it was. Instead Agent Locke just gave the Petitioner the paper and told the Petitioner that it "was a piece of paper saying it was okay for him to talk to [the Petitioner]. He did not tell [the Petitioner] that [the Petitioner] was waiving any rights. He did not tell [the Petitioner] that [the Petitioner] did not have to talk to him." The Petitioner talked with Agent Locke for "three or four hours" and denied doing anything wrong. Eventually, the Petitioner said he was leaving and tried to exit the door. However, Agent Locke told the Petitioner "don't touch that door knob," and when the Petitioner turned to look at Agent Locke, the agent had his hand on his firearm. The Petitioner maintained that he had not been advised of his rights at this point, but he noted that he had "probably signed three or four" waivers by that point. The Petitioner explained, "He kept telling me, [']sign this paper,['] so I just kept signing the paper. He was a police officer. Hell, I trusted him. I didn't think nothing about it." The Petitioner noted that he could read but that he did not read any of the waivers that he had been asked to sign. In total, the interrogation lasted approximately twelve to fourteen hours. Between 5:30 and 7:00 the next morning, the Petitioner was taken into custody and charged with first degree murder.

After the Petitioner had been booked, Detective Knight came to the Petitioner's cell, had the Petitioner to sign yet another Miranda waiver, and asked the Petitioner to take him to the site where he claimed he had disposed of the gun. The Petitioner opined that the police took multiple statements from him because "they didn't have a strong enough case and they was trying to gather whatever they could[.]"

The Petitioner said that Agent Locke's trial testimony—that the Petitioner said, "I shot the b****"—was false. The Petitioner explained:

The reason I had so many different statements was because [Agent] Locke kept on telling me that what I was saying was not consistent with the evidence, so I would change it up to tailor whatever he said . . . . The only reason why I had so many inconsistent statements is because I really did not know what was going on. The only reason why I made the statement in

the first place—the only one reason why I made that statement was because I thought it was in my best interest.

According to the Petitioner, Agent Locke had told him that, if he did not cooperate, the Petitioner would face the death penalty. However, if the Petitioner did cooperate, Agent Locke said he would "get [the Petitioner] five years involuntary manslaughter." The Petitioner said the only reason he confessed to a murder he did not commit was because Agent Locke asked him, "Would you rather do five years [as] an innocent man or would you rather die as an innocent man?"

The Petitioner stated that he did not get along with the public defender because, at their first meeting, the public defender asked, "[A]re you ready to go to the penitentiary?" The Petitioner hired trial counsel to get the public defender off of his case, but the court would not remove the public defender. The Petitioner maintained that trial counsel had less than two months to prepare for trial after he was retained by the Petitioner's family. The Petitioner noted that, when trial counsel filed his motion for continuance, he argued to the court that he would only have less than a month and a half to prepare for trial for a double murder. The Petitioner recalled that the trial court denied the motion for continuance, citing that the public defender had already done work on the case and was still second chair on the case. However, the Petitioner claimed that the public defender's office had not worked on his case. The Petitioner estimated that he saw trial counsel three or four times before trial. Trial counsel did not visit for hours, but he came "for a nice amount of time." The Petitioner recalled that trial counsel discussed trial strategy, witnesses' inconsistent statements, and "a number of things" during these meetings. The Petitioner was able to give trial counsel names and contact information of people who might have assisted the defense.

The Petitioner stated that he was "undecided" about whether he was going to testify at trial. Trial counsel told him it was in his best interest to testify, but the Petitioner was worried about his lack of education. He said he "didn't want to get twisted up and turned around and it hurt me more that it help me," so he decided not to testify. The Petitioner claimed he told trial counsel that he was not going to testify before the trial began.

Regarding mitigating factors at sentencing, the Petitioner said he told trial counsel that he had a rough childhood but "nothing major." The Petitioner also stated that he wanted "to challenge the [State's] closing argument in its entirety, not just certain lines." The Petitioner also claimed that his Fourth Amendment right against unreasonable seizure was violated when Agent Locke prevented the Petitioner from leaving the interrogation room. Additionally, the Petitioner stated that he "didn't receive a fair and impartial trial being that there was too many—there was too many things not done." For example, the Petitioner stated that many "crucial points" were not raised or argued

effectively; the witnesses' stories did not add up; Mr. Waller's parents arrived at and left the scene before the police arrived; the jury never heard that the person who found the body was not on the scene when the police arrived; "there was no physical evidence whatsoever"; trial counsel did not challenge the denial of a change of venue after the crime was "highly, highly publicized, newspapers, radio, more than one report on the news"; trial counsel did not challenge preemptory strike of jurors; and trial counsel did not "challeng[e] the fairness of the cross selection" when only four African-Americans were in the jury pool and twelve percent of Wilson County's population was African-American.

On cross-examination, the Petitioner stated that he contacted Ms. Wheeler before trial, but he maintained that Ms. Wheeler did not contact anyone with her information because it was trial counsel's job to contact Ms. Wheeler. The Petitioner confirmed that he remembered the "events with Agent Locke" very clearly and there was "not one doubt" in his mind about what happened during his interview with Agent Locke. Even though the Petitioner had a clear memory of the interview, he maintained that Ms. Wheeler's testimony that he took pills was relevant to his state of mind. He explained:

> . . . The difference that the pills make is that intoxication is not a defense, but intoxication is a relevant factor into whether or not you can voluntarily or knowingly waive any rights. If I'm not mistaken, according to law, you can't waive rights under the influence of mind-altering drugs. . . . Taking pills is under the influence. That goes without saying.

Despite this contention, the Petitioner agreed that the day he turned himself in was a "normal day" and that he operated under the influence of that many drugs on a daily basis. However, he maintained that he was still "under the influence" despite his ability to function normally.

The Petitioner claimed that he confessed to the crime "under threatened coercion" and "under manipulation and trickery" but not voluntarily. When asked about how he was tricked into making statements to other witnesses,[11] the Petitioner noted that Mr.

---

[11] In our opinion from the Petitioner's direct appeal, we noted that "Mr. Hardy said that [the Petitioner] returned to his apartment later that afternoon and muttered under his breath that 'he [had] shot somebody.'" Additionally, Mr. Hardy's girlfriend, Krissy Foster, said the Petitioner asked her to wash his hair for him, asked for some clothes, and admitted that he had killed someone. Jason Curtis Johnson, 2006 WL 407767, at *3. Leah Mendoza testified that the Petitioner had called her the day following the murder and asked her to tell the police that he had been at her house on the day of the murder. Ms. Mendoza asked the Petitioner why he "did it," and he responded, "You know me. Business." Id. at *2. Megan Bartlett testified that the Petitioner borrowed her car and said, "I'm going to kill a b**** if I don't get my $900." Id.

Hardy said in his first statement that he had not seen the Petitioner on the day of the offense and that Mr. Hardy did not know anything about the crime. The Petitioner claimed that Mr. Hardy implicated the Petitioner under police pressure. Similarly, the Petitioner said Ms. Foster originally told police that she had "told [the Petitioner] to wash his own hair," but she changed her story and said she washed his hair after "they get to talking about taking her baby away[.]" As to Ms. Mendoza, the Petitioner claimed, "[T]hey twisted this woman up to the point to where she was tore all to pieces on the stand. They made her say stuff that she didn't even put in her original statement."[12] Regarding the statement he supposedly made to Megan Bartlett, the Petitioner said that he and Ms. Bartlett were not on good terms "because of a personal relationship," and he thought that may have motivated her testimony. The Petitioner denied saying anything about killing someone over $900. He also stated that he did not have reason to kill Mrs. Waller because "a dead person does not pay."

The Petitioner opined that there were only four African-Americans in the jury pool because there was a plot against him.

On redirect examination, the Petitioner stated that he "pop[ped] pills" and that "he was liable to have took [twenty] pills" over the course of a day. He said he was "kind of like speed-bombing" when he took the pills at Ms. Wheeler's house because he took a mixture of pills—normally he took one or the other. He said the pills made him "feel real good." The Petitioner said his judgment was impaired when he was under the influence of the pills. He agreed that the drugs could make him do something he otherwise would not have done. Additionally, the Petitioner asserted that he "was convicted of being a drug dealer, not a murderer." He stated:

> There was uncharged conduct that was supposed to have been given to the jury which never was. [The trial court] said that ['']if we have anything like that, we have to allow it in, that they have an absolute right to that.['] It was never given to the jury and nor was it objected to and nor was it reserved for appeals. It was never brought up on a motion for new trial and it was brought up on the record. I had to wait until now to bring up on ineffective assistance of counsel, in which it did prejudice me because I was convicted for being a drug dealer, not for murder because murder was not proved.

---

[12] We note that the Petitioner did not admit any of these witnesses' prior statements to police as exhibits to the post-conviction hearing.

- 13 -

After reviewing and considering the credibility of the witnesses, the post-conviction court denied relief and in doing so credited trial and appellate counsel.[13] The court noted that the question of the sufficiency of the evidence as to the viability of the fetus was addressed on direct appeal, and the post-conviction court stated that the jury was instructed that it could believe or disbelieve the expert's testimony on the issue. The post-conviction court noted that, although Dr. Li testified that viability could not be determined, other proof at trial showed that the fetus was viable. The post-conviction court also noted that the proof at trial showed that the Petitioner knew Mrs. Waller was pregnant. In short, the post-conviction court concluded that the issue of viability had been determined previously on direct appeal and stated it "would adopt those, obviously, the findings of the jury . . . as well as the statements and the opinion of the Court of Criminal Appeals." Although the post-conviction court did not make any specific findings as to trial counsel's effectiveness in failing to call an expert witness, by accrediting trial counsel's testimony, the post-conviction court necessarily accepted trial counsel's statement that he felt he did not need to call an expert and could rely on rigorous cross-examination of Dr. Gerber.

Regarding the Petitioner's claim that there was no proof to convict him in this case, the post-conviction court noted that twelve jurors and this court had found there was sufficient evidence to convict him. Regarding the hair sample that was not tested, the post-conviction court found that trial counsel made a reasoned, strategic decision not to test the sample to leave open the opportunity to argue that it came from Mr. Waller. As such, his performance was not deficient.

As to the preemptory strikes against jurors, the post-conviction court noted that one African-American was on the jury and another African-American was struck by trial counsel. Even though trial counsel could not recall why he struck that juror, the post-conviction court stated that jury selection was an "inexact science" and concluded trial counsel made a strategic gut decision to exercise a preemptory strike. Additionally, the post-conviction court found that there was no proof that there was a plot against the Petitioner with regard to the jury composition, noting that the jury pool was selected at random from the Wilson County driver's license list.

Regarding the Petitioner's allegation that trial counsel should have called Ms. Wheeler to testify at the suppression hearing about his pill use, the post-conviction court noted that the Petitioner admitted that he took as many as twenty pills a day. Additionally, the court stated, "All [Ms. Wheeler's] going to do is say essentially what came out anyway in the suppression hearing—how many pills did he take." As such, her testimony "does not affect the admission of the Miranda waiver." Moreover, the court

---

[13] The post-conviction court's ruling is taken from the findings issued from the bench as well as from a written order denying post-conviction relief.

noted that Agent Locke testified at the suppression hearing and trial that he read the Petitioner the Miranda waiver and that the Petitioner signed it multiple times during the interview. Detective Knight also read the Petitioner a Miranda waiver and had the Petitioner sign the same before he spoke to him. Further, the court noted that Agent Locke testified that the Petitioner was cooperative, was given several breaks during the interview, and that the Petitioner was allowed to read, correct, and modify every type-written statement he gave. The post-conviction court found that trial counsel did not attempt to have the Petitioner testify about his pill use at the suppression hearing and concluded that the Petitioner was not prohibited from testifying. Additionally, the post-conviction court noted that this court had addressed the suppression of the Petitioner's statements on direct appeal. Accordingly, the post-conviction court concluded that the Petitioner had "failed to carry his burden of proof by clear and convincing evidence."

The court noted that Agent Locke commented on the Petitioner's ability to testify during his trial testimony. However, the court understood why trial counsel did not object or ask for a curative instruction when trial counsel expected that the Petitioner would testify. The court acknowledged that the Petitioner claimed that he had told trial counsel he was not going to testify prior to trial, but the post-conviction court found that the Petitioner had not proven his claim by clear and convincing evidence "when one balances those two different versions."

As to the sentencing issues, the post-conviction court noted that this court had determined that the Petitioner was a professional criminal for whom consecutive sentencing was appropriate and affirmed the aggregate sentence. The court also stated that judges had wide latitude in sentencing. Consequently, the post-conviction court concluded that "the Court of Criminal Appeals ha[d] addressed all the sentencing issues" but based on a review of the record, the post-conviction court found that there was "ample advisory factors" to sentence the Petitioner to twenty-five years for his second degree murder conviction because he was a professional criminal and he was on probation at the time of the offense.

Consequently, the post-conviction court found that the Petitioner had failed to carry his burden of proof by clear and convincing evidence and denied relief. This timely appeal followed.

## Analysis

In order to prevail on a petition for post-conviction relief, a petitioner must prove all factual allegations by clear and convincing evidence. Jaco v. State, 120 S.W.3d 828, 830 (Tenn. 2003). Post-conviction relief cases often present mixed questions of law and fact. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001). Appellate courts are bound by the post-conviction court's factual findings unless the evidence preponderates against

- 15 -

such findings. Kendrick v. State, 454 S.W.3d 450, 457 (Tenn. 2015). When reviewing the post-conviction court's factual findings, this court does not reweigh the evidence or substitute its own inferences for those drawn by the post-conviction court. Id.; Fields, 40 S.W.3d at 456 (citing Henley v. State, 960 S.W.2d 572, 578 (Tenn. 1997)). Additionally, "questions concerning the credibility of the witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the [post-conviction court]." Fields, 40 S.W.3d at 456 (citing Henley, 960 S.W.2d at 579); see also Kendrick, 454 S.W.3d at 457. The post-conviction court's conclusions of law and application of the law to factual findings are reviewed de novo with no presumption of correctness. Kendrick, 454 S.W.3d at 457.

*Ineffective Assistance of Counsel*

The right to effective assistance of counsel is safeguarded by the Constitutions of both the United States and the State of Tennessee. U.S. Const. amend. VI; Tenn. Const. art. I, § 9. In order to receive post-conviction relief for ineffective assistance of counsel, a petitioner must prove two factors: (1) that counsel's performance was deficient; and (2) that the deficiency prejudiced the defense. Strickland v. Washington, 466 U.S. 668, 687 (1984); see State v. Taylor, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (stating that the same standard for ineffective assistance of counsel applies in both federal and Tennessee cases). Both factors must be proven in order for the court to grant post-conviction relief. Strickland, 466 U.S. at 687; Henley, 960 S.W.2d at 580; Goad v. State, 938 S.W.2d 363, 370 (Tenn. 1996). Accordingly, if we determine that either factor is not satisfied, there is no need to consider the other factor. Finch v. State, 226 S.W.3d 307, 316 (Tenn. 2007) (citing Carpenter v. State, 126 S.W.3d 879, 886 (Tenn. 2004)). Additionally, review of counsel's performance "requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S. at 689; see also Henley, 960 S.W.2d at 579. We will not second-guess a reasonable trial strategy, and we will not grant relief based on a sound, yet ultimately unsuccessful, tactical decision. Granderson v. State, 197 S.W.3d 782, 790 (Tenn. Crim. App. 2006).

As to the first prong of the Strickland analysis, "counsel's performance is effective if the advice given or the services rendered are within the range of competence demanded of attorneys in criminal cases." Henley, 960 S.W.2d at 579 (citing Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)); see also Goad, 938 S.W.2d at 369. In order to prove that counsel was deficient, the petitioner must demonstrate "that counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." Goad, 938 S.W.2d at 369 (citing Strickland, 466 U.S. at 688); see also Baxter, 523 S.W.2d at 936.

- 16 -

Even if counsel's performance is deficient, the deficiency must have resulted in prejudice to the defense.  Goad, 938 S.W.2d at 370.  Therefore, under the second prong of the Strickland analysis, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  Id. (quoting Strickland, 466 U.S. at 694) (internal quotation marks omitted).

The Petitioner alleges several instances in which he claims he received ineffective assistance of counsel.  We will address each in turn.

### a. Trial counsel's "inadequate trial preparation and performance"

The Petitioner asserts that trial counsel was inadequately prepared for trial because he was admitted to practice law a little over a year prior to the Petitioner's trial and trial counsel had "less than two months" to prepare for the November 12-13, 2003 trial. However, trial counsel testified that, even though he filed the agreed order substituting counsel on September 17, 2003, he had actually been working on the Petitioner's case for four to six months prior to trial.  Additionally, we note that, on the same day that he filed the agreed order substituting counsel, trial counsel litigated the motion to suppress.  From our review of the transcript of the motion to suppress, it is clear that trial counsel was familiar with the facts of the case and that he had spoken with the Petitioner and heard many of the same allegations that the Petitioner expressed during the post-conviction hearing, such as the Petitioner's request for counsel during the interrogation.  As such, it appears that trial counsel had been working on this case prior to his filing the agreed order substituting counsel.  The Petitioner has failed to show that counsel was deficient in this regard.

The Petitioner also asserts that trial counsel failed to use the resources of the public defender's office and did not consult with co-counsel from the public defender's office.  Trial counsel testified that he "absolutely" discussed the case with the public defender prior to trial.  Although trial counsel admitted that he did not recall speaking with the public defender about a psychological evaluation, he stated that he did not intend to use psychological evidence at trial because the entire trial strategy was to assert that Mr. Waller, not the Petitioner, was the killer.  The Petitioner does not explain how a psychological evaluation would have benefited that strategy.  Additionally, no psychological evaluation was presented at the post-conviction hearing.  This court has long held that "[w]hen a petitioner contends that trial counsel failed to discover, interview, or present witnesses in support of his defense, these witnesses should be presented by the petitioner at the evidentiary hearing."  Black v. State, 794 S.W.2d 752, 757-58 (Tenn. Crim. App. 1990).  The Petitioner cannot establish that he was prejudiced unless he can produce a material witness who "(a) could have been found by reasonable

- 17 -

investigation and (b) would have testified favorably in support of his defense if called." Id. Without hearing the witness's testimony, neither the post-conviction court nor this court can determine whether the Petitioner suffered prejudice from trial counsel's failure to call such witness. See id. Accordingly, the Petitioner has failed to establish that trial counsel was ineffective for failing to have the Petitioner undergo psychological examination.

The Petitioner asserts that trial counsel was ineffective because trial counsel represented a potential witness, Kenton Ingle, in another matter. The Petitioner claims that trial counsel refused to let the public defender's office interview Mr. Ingle. However, there is no proof in the record that trial counsel prevented the public defender's office from interviewing Mr. Ingle. Moreover, the Petitioner testified at the suppression hearing that he had no objection to trial counsel representing both himself and Mr. Ingle. Accordingly, the Petitioner has failed to prove that trial counsel was deficient or that he was prejudiced by any alleged deficiency.

Next, the Petitioner asserts that trial counsel was ill-prepared for the suppression hearing because he failed to contact or call Ms. Wheeler to testify about the pills the Petitioner took prior to turning himself into the police. However, trial counsel testified that he was well-aware of the Petitioner's allegation that he was intoxicated during his police interview. Additionally, the Petitioner admitted during the post-conviction hearing that he took large amounts of drugs on a daily basis. Further, Agent Locke and Detective Knight testified at the suppression hearing that the Petitioner appeared to be lucid and had denied being under the influence of any drugs at the time of their interviews. Additionally, Detective Knight testified at the post-conviction hearing that the Petitioner was alert when he took Detective Knight to the location where he supposedly disposed of the murder weapon. As such, the record does not preponderate against the post-conviction court's finding that Ms. Wheeler's testimony would not have made a difference in the trial court's ruling that the Petitioner had voluntarily waived his Miranda rights and confessed to the crime.

The Petitioner contends that trial counsel was ineffective when he failed to object to the State's references to the Petitioner's uncharged drug dealing during trial and that trial counsel failed to submit a jury charge regarding the uncharged conduct. A review of the record from the Petitioner's direct appeal shows that trial counsel did not object to testimony that the Petitioner was a drug dealer and that the trial court did not give the jury any instructions about uncharged conduct. However, as the State notes in its brief, trial counsel was not asked about his decision not to object to the testimony that the Petitioner was a drug dealer or his failure to ask for a jury instruction. Instead, the only proof of "uncharged conduct" which was presented at the post-conviction hearing was a nonsensical comment from the Petitioner himself. Moreover, the post-conviction court

- 18 -

made no findings related to the testimony about uncharged conduct. Nevertheless, it is clear from the trial transcript that trial counsel was presenting a theory that Mr. Waller killed Mrs. Waller and her fetus because Mr. Waller owed the Petitioner money for drugs and Mrs. Waller was due to receive a large amount of money as inheritance from her relative. As such, trial counsel's failure to object to the uncharged conduct appears to have been a tactical decision, which we will not second-guess. See Granderson, 197 S.W.3d at 790. The Petitioner has failed to prove that trial counsel was deficient for failing to object to the testimony that the Petitioner was a drug dealer. As to trial counsel's failure to ask for a jury instruction, we first note that the trial court stated that it would need to give a jury instruction about uncharged conduct. There is no indication that the trial court's failure to give such instruction was the result of trial counsel's failure to request said instruction. However, even if trial counsel was deficient for failing to note the lack of the instruction, the Petitioner has not proved that he was prejudiced. Over the course of the trial, there was relatively little testimony that the Petitioner was a drug dealer. Conversely, the Petitioner gave four written statements to police admitting to killing Mrs. Waller, and he made comments to other witnesses indicating that he had killed someone. As such, the Petitioner is not entitled to relief on this issue.

The Petitioner argues that trial counsel was ineffective when he failed to object to Agent Locke's giving an "unqualified 'expert' opinion" about the blood spatter and bullet trajectory during his testimony. At the post-conviction hearing, trial counsel stated that he would have "clearly objected" if Agent Locke had offered "some kind of scientific conclusion that [was] based upon the trajectory of this blood spatter[.]" At trial, Agent Locke testified that the blood spatter on Mrs. Waller's legs appeared to be going in a downward direction, indicating to Agent Locke that "the entrance wound would have been elevated at the time the blood came, that the wound would have been from the top in a downward direction." However, in addition to Agent Locke's testimony, Dr. Gerber, who was accepted as an expert in forensic pathology, testified that the bullets travelled in a downward trajectory through Mrs. Waller's brain. Therefore, the Petitioner has failed to prove that he was prejudiced by trial counsel's failure to object to Agent Locke's testimony about the blood spatter.

Finally, the Petitioner claims that trial counsel filed a "bare boned" motion for new trial and that "[trial] counsel's deficient performance in drafting of the Motion for a New Trial caused the Petitioner prejudice in that many issues were not preserved for appeal." However, the Petitioner fails to identify what issues should have been preserved, and he makes no argument as to whether those issues would have been meritorious. As such, we are unable to determine what, if anything, trial counsel should have raised in the motion for new trial and whether those issues would have been meritorious on appeal. Therefore, the Petitioner has failed to prove that trial counsel was deficient or that he was prejudiced by the alleged deficiency.

- 19 -

<u>b. Trial counsel's "errors concerning [the] Petitioner's Sixth Amendment right to a fair and impartial jury"</u>

The Petitioner asserts that trial counsel was deficient when he failed to object to the only African-American who was placed on the jury because that individual was related to the Petitioner. The Petitioner claims that he was prejudiced by trial counsel's alleged deficiency because "had [trial counsel] properly challenged this juror, that would have left zero African-Americans on the jury, which is not an adequate cross-section of the community." However, there is no indication as to when trial counsel learned that the juror was related to the Petitioner. As such, the Petitioner has failed to establish that trial counsel was deficient. Accordingly, the Petitioner's claim is without merit.

The Petitioner also contends that "his Sixth Amendment right to a fair trial was violated, and the failure of counsel to raise the issue constitutes ineffective assistance of counsel." To the extent that the Petitioner raises a free-standing claim that his Sixth Amendment rights were violated because the venire did not contain a representative cross-section of the community, this claim has been waived for the purposes of post-conviction relief. Tenn. Code Ann. § 40-30-106(g) (2014).[14]

As to the Petitioner's claim that counsel was ineffective for failing to challenge the makeup of the venire and the jury, the post-conviction court noted that venires were typically chosen from the Wilson County driver's license records. The Petitioner has presented no proof that the venire was chosen in a different manner or that any underrepresentation of the African-American population was "due to the systematic exclusion of the group in the jury-selection process." See Duren v. Missouri, 439 U.S. 357, 364 (1979). The record does not preponderate against the post-conviction court's finding that there was no "plot" against the Petitioner to exclude African-Americans from the venire. Additionally, trial counsel, not the State, was the only person to use a preemptory strike against an African-American juror. Accordingly, the record does not preponderate against the post-conviction court's finding that the State did not use its preemptory challenges to strike any African-American jurors, and there is no evidence to support a prima facie case of purposeful discrimination that trial counsel should have challenged. See State v. Hugueley, 185 S.W.3d 356, 368 (Tenn. 2006) (citing Batson v. Kentucky, 476 U.S. 76, 96 (1976)). The Petitioner has failed to establish that trial counsel was deficient, and this claim is without merit.

---

[14] We also note that the Petitioner claims that the population of Wilson County is twelve percent African-American. Trial counsel testified that there were thirty to forty potential jurors in the jury pool, four of which were African-American. Twelve percent of forty is 4.8.

## c. Failure to have evidence tested

The Petitioner asserts that trial counsel rendered ineffective assistance when he failed to have the hair found in the victim's hand tested. Trial counsel testified that he made a strategic decision not to have the hair tested so that he could argue that the hair had come from Mr. Waller. We will not second-guess a reasonable strategic decision. See Granderson, 197 S.W.3d at 790. Furthermore, we note that the Petitioner did not present any test results pertaining to the hair at the post-conviction hearing. Without knowing what the test results would have yielded, we cannot say that the Petitioner was prejudiced by the failure to have the hair tested. Black, 794 S.W.2d at 757-58. Accordingly, the Petitioner has failed to demonstrate that trial counsel was deficient for failing to test the hair or that the alleged deficiency resulted in prejudice.

The Petitioner also contends that trial counsel should have had the bullets found in the victim's bedroom tested for a match to those used in the shooting. We note that testimony at trial established that the Petitioner told the police that he had gotten the bullets he used during the offense from the victim's house. Further, the Petitioner did not present any evidence at the post-conviction hearing as to what test results of the bullets found in the victim's bedroom would have yielded. Therefore, the Petitioner has failed to establish that he suffered prejudice. Id.

Finally, the Petitioner argues that trial counsel failed to establish that no blood was found in the car that the Petitioner used to travel to and from the crime scene. He asserts that introduction of that evidence "could likely have changed the outcome of the trial." However, we fail to see how testimony that there was no blood in the car would have changed the outcome at trial when the Petitioner's four written confessions, along with his statements to other witnesses, were introduced into evidence. The Petitioner has failed to prove that he was prejudiced by the alleged deficiency. This issue is without merit.

## d. "Trial errors"

The Petitioner claims that trial counsel should have called Brian Hanna to testify because Mr. Hanna lived in the basement of the Waller home, was alleged to have been with Mr. Waller on the day of the offense, and was the first person to find Mrs. Waller's body. However, the Petitioner does not explain what he anticipates Mr. Hanna's testimony would show. Additionally, Mr. Hanna did not testify at the post-conviction hearing. As such, the Petitioner has failed to prove that he was prejudiced by the failure to call Mr. Hanna at trial. Id.

Additionally, the Petitioner claims that trial counsel should have asked the court to give the jury a missing witness instruction because the State did not call Mr. Hanna to

testify. However, the Petitioner failed to provide any citation to authority or any argument as to why trial counsel should have requested such an instruction. The Petitioner has waived our consideration of the issue. Tenn. Ct. Crim. App. R. 10(b).

The Petitioner argues that trial counsel did not impeach Leah Mendoza, Krissy Foster, or Antonio Hardy, who apparently gave prior statements which were inconsistent with their trial testimony. Additionally, the Petitioner contends that trial counsel did not "properly impeach" Damon Brock's testimony that Mr. Waller was with Mr. Brock all day. However, trial counsel testified that he did cross-examine each witness and was able to identify some inconsistencies between their testimony and their prior statements. Further, the Petitioner bears the burden of proving all factual allegations by clear and convincing evidence. Jaco, 120 S.W.3d at 830. The witnesses' prior statements were not included in the record for the direct appeal or for this appeal. Accordingly, we are unable to determine what the witnesses said in their prior statements, outside of the limited testimony about their contents, and we cannot determine whether they were inconsistent with the witnesses' trial testimony. Therefore, the Petitioner has failed to establish that trial counsel was deficient for failing to cross-examine the witnesses about these statements or that he was prejudiced by that deficiency.

Additionally, the Petitioner contends that trial counsel should have asked Mr. Waller why his parents came to the crime scene and left before the police arrived and that trial counsel should have asked the police why they did not question Mr. Waller's parents about the missing weapon. However, the Petitioner presented no proof as to this issue at the post-conviction hearing. Consequently, we have no way to determine what this line of inquiry would have yielded. The Petitioner has failed to prove by clear and convincing evidence that trial counsel was deficient on this issue or that the Petitioner suffered prejudice from such deficiency. See Black, 794 S.W.2d at 757-58.

The Petitioner asserts that trial counsel should have asked Mr. Brock what date he helped Mr. Waller deliver some furniture to the Petitioner's house as partial payment for a drug debt Mr. Waller owed to the Petitioner. The Petitioner claims that testimony about the date of the transaction would undermine the State's theory that the Petitioner killed Mrs. Waller over Mr. Waller's drug debt. However, we fail to see how this testimony would undermine the State's theory of the case because both Mr. Brock and Mr. Waller testified at trial that the furniture was meant to be partial payment of the drug debt and some of the debt was still outstanding. The Petitioner has failed to show that trial counsel was deficient for failing to ask Mr. Brock what date he helped Mr. Waller deliver furniture to the Petitioner.

Further, the Petitioner contends that trial counsel's failure to object to photographs of the fetus as being unfairly prejudicial was deficient. However, the record on direct appeal shows that trial counsel did challenge introduction of the photographs and that the

trial court held a jury-out hearing in which Dr. Gerber selected three photos of the fetus to use in his testimony. Ultimately, only one photo was introduced into evidence. The Petitioner challenged the introduction of that photo on appeal, and this court determined that its probative value exceeded the danger of prejudice. Jason Curtis Johnson, 2006 WL 407767, at *10. Accordingly, the Petitioner has failed to establish that trial counsel was deficient.

Finally, the Petitioner asserts that the cumulative effect of these "trial errors" caused him prejudice. The cumulative error doctrine recognizes that there may be many errors committed in trial proceedings, each of which constitutes mere harmless error in isolation, but "have a cumulative effect on the proceedings so great at to require reversal in order to preserve a defendant's right to a fair trial." State v. Hester, 324 S.W.3d 1, 76 (Tenn. 2010). When considering cumulative error, this court may look to the case as a whole, the numbers of errors committed, their interrelationship and combined effect, and the strength of the State's case. Id. (quoting United States v. Sepulveda, 15 F.3d 1161, 1196 (1st Cir. 1993)). In this case, the Petitioner confessed to the crime, and his confession was introduced at trial. Accordingly, the Petitioner has not established that the cumulative effect of trial counsel's "trial errors" resulted in prejudice.

### e. Trial counsel failed to object to a State's witness commenting on the Petitioner's right to testify

The Petitioner argues that trial counsel should have objected or moved for a mistrial when Agent Locke made the following comment during cross-examination:

> [TRIAL COUNSEL]: Okay. So basically all we have to say that [the Petitioner's typewritten statements] are in fact just as you say they are is your word against [the Petitioner's], is that correct?

> [AGENT LOCKE]: They contain his signature. I'm sure he could take the stand and say that he didn't sign it, but—

The State concedes that Agent Locke's comment was improper. However, the State contends that trial counsel's performance was not deficient because, at the time Agent Locke made the comment, trial counsel believed that the Petitioner was going to testify at trial.

Trial counsel testified that the Petitioner's testimony was a crucial part of the defense theory that Mr. Waller actually committed the murder. At the time Agent Locke made the challenged comment, trial counsel believed that the Petitioner would take the stand and testify that he had an eighth-grade education and that he did not make the statements to police freely and voluntarily. The Petitioner claims that he told trial

- 23 -

counsel that he did not want to testify before the trial. However, trial counsel recalled that the Petitioner told trial counsel he was not going to testify on the last day of trial—the day after Agent Locke testified—and the post-conviction court credited trial counsel in its order denying post-conviction relief. As such, trial counsel made a tactical decision not to object based on a valid, informed trial strategy, which we will not question. See Granderson, 197 S.W.3d at 790. The Petitioner has failed to prove that trial counsel was deficient for failing to object to Agent Locke's comment or move for a mistrial because, at the time it was made, trial counsel believed that the Petitioner would testify. The Petitioner is not entitled to relief on this issue.

### f. Trial counsel's failure to object to "prosecutorial misconduct"

The Petitioner contends that trial counsel was ineffective when he failed to object to several statements made during the State's closing arguments. It has long been recognized that the State and defense are allowed "wide latitude" when arguing their cases to the jury. State v. Goltz, 111 S.W.3d 1, 5 (Tenn. Crim. App. 2003). The State plays a unique role in criminal trials and, consequently, "must refrain from argument designed to inflame the jury and should restrict its commentary to matters in evidence or issues at trial." State v. Hill, 333 S.W.3d 106, 131 (Tenn. Crim. App. 2010). In order to merit a new trial, the State's argument must be so inflammatory or improper that it affected the jury's verdict to the defendant's detriment. Id.; Goltz, 111 S.W.3d at 5.

First, the Petitioner claims that trial counsel should have objected during the State's closing argument when the prosecutor commented that Mrs. Waller had raised her arm to defend herself when she was shot. The Petitioner asserts that this comment was not supported by the evidence. However, this comment was a permissible inference from the proof presented at trial. Trial counsel testified at the post-conviction hearing that the evidence shows that the victim was on her knees with her arm in front of her face at the time of the shooting. Additionally, as this court stated on direct appeal, "Dr. Gerber stated that the bullets' trajectory was consistent with the shooter standing above the victim when he fired his weapon, and there was stippling on the victim's arm consistent with the victim holding her arm up as a defensive gesture." Jason Curtis Johnson, 2006 WL 407767, at *12. The Petitioner has failed to prove that trial counsel was deficient for failing to object to the State's comment that Mrs. Waller had her arm raised in self-defense.

Second, the Petitioner argues that trial counsel should have objected during the State's closing argument when the prosecutor stated that Mrs. Waller was on her knees, begging for her life, when she was shot. The Petitioner contends that such argument was improper because "[t]here was not testimony that Mrs. Waller was squatting down begging for her life as there were no eye witnesses to the shooting[.]" However, trial counsel recalled that there was evidence that Mrs. Waller was shot while she was on her

knees. Further, at trial Agent Locke testified that the blood spatter pattern on Mrs. Waller's pants indicated that her pants were riding up and causing "ruffles" which prevented the blood for staining portions of Mrs. Waller's pants. Such pattern indicated to Agent Locke that Mrs. Waller was squatting or kneeling at the time she was killed. The conclusion that she was begging for her life was a permissible inference from the proof presented at trial. The Petitioner has failed to prove that trial counsel was deficient for failing to object to the prosecutor's comment that Mrs. Waller was kneeling and begging for her life.

Finally, the Petitioner claims that trial counsel should have objected to the State's closing argument when the prosecutor made comments about the Petitioner's status as a drug dealer; the prosecutor referred to evidence that was not in the record, such as people who did not testify at trial; the prosecutor informed the jury that the Petitioner's girlfriend was also facing charges for the death of Mrs. Waller; the prosecutor "misstated the facts as the time length of the interrogation"; the prosecutor claimed that the testimony about the baby's viability was "uncontradicted"; and the prosecutor stated that the officers had "checked everywhere [Mr. Waller] was" when there was "a complete lack of testimony as to any investigation officers did pertaining to Mr. Waller[.]" However, no proof was presented about these comments during the post-conviction hearing, and the Petitioner did not ask trial counsel why he failed to object to them. As such, the Petitioner has failed to prove that trial counsel was deficient for failing to object to these comments.

## g. Trial counsel failed to present proof as to the viability of the fetus or preserve the issue for appeal

The Petitioner argues that trial counsel was ineffective for failing to present expert testimony that a fetus "weighing 500 grams (less than one pound) at that stage in the pregnancy [twenty-three to twenty-four weeks] could not have survived outside the womb[.]" The Petitioner contends that Dr. Li's deposition testimony highlighted "huge problems" in Dr. Gerber's trial testimony and that it showed trial counsel should have called a defense expert at trial. Specifically, the Petitioner notes that Dr. Li incorrectly assumed that Dr. Gerber relied on Mrs. Waller's clinical history when he formed his opinion about the viability of the fetus, but such history was not part of Dr. Gerber's file. At trial, Dr. Gerber admitted on cross-examination that the fetus was at the edge of viability and that "it could have survived, it could not have survived." In his deposition, Dr. Li agreed with Dr. Gerber's assessment that the fetus was at the margin of viability and stated that it was not possible to determine whether any one individual fetus was viable because there were too many variables. It is true that Dr. Gerber and Dr. Li came to different conclusions as to the fetus's viability. However, both agreed that Mrs. Waller's fetus was on the margin of viability and that there was no way to definitely determine whether it was viable. Accordingly, the Petitioner has failed to establish that

he was prejudiced by trial counsel's failure to call a defense expert witness to testify about the viability of the fetus.

Additionally, the Petitioner argues that appellate counsel was ineffective for failing to "fully" raise and argue on appeal the issue of sufficiency of the evidence concerning the viability of the fetus. However, the Petitioner does not explain what appellate counsel should have argued on appeal as to this issue. Further, this court specifically addressed the sufficiency of the evidence concerning the viability of the fetus and determined that there was sufficient evidence to support the Petitioner's conviction for second degree murder. Jason Curtis Johnson, 2006 WL 407767, at *12-13. The Petitioner has failed to show that appellate counsel was deficient or that he was prejudiced by appellate counsel's omission.

h. Appellate counsel failed to "fully raise the issue of sufficiency of the evidence"

The Petitioner contends that appellate counsel "failed to properly raise[] all the points" on the issue of the sufficiency of the evidence underlying the Petitioner's conviction for first-degree murder. The Petitioner asserts that, if the issue had been properly raised "at trial and on appeal," the outcome of the trial would have been different. However, the Petitioner does not identify which "points" appellate counsel should have raised and argued on appeal. Instead, the Petitioner's brief simply re-litigates the issue of the sufficiency of the evidence underlying his first-degree murder conviction. Sufficiency of the evidence is not a cognizable claim for post-conviction relief. Workman v. State, 868 S.W.2d 705, 711 (Tenn. Crim. App. 1993). The Petitioner is not entitled to relief.

i. Trial counsel failed to put on any evidence of mitigating factors during the sentencing hearing

The Petitioner argues that he was denied effective assistance of counsel when trial counsel failed to investigate and present mitigating evidence at the sentencing hearing about the Petitioner's family background, troubled childhood, and mental health history. The Petitioner avers that trial counsel's failure to present such evidence was not an informed, strategic decision and that, if trial counsel had "offered an accurate life profile," the Petitioner would have been sentenced to less than twenty-five years for his second degree murder conviction. However, the Petitioner failed to present any evidence about these mitigating factors at the post-conviction hearing. As such, he has failed to prove that he was prejudiced. See Black, 794 S.W.2d at 757-58. The Petitioner is not entitled to relief on this issue.

*Involuntary Waivers and Confessions*

The Petitioner argues that his Fifth Amendment rights were violated because his Miranda waivers were not signed voluntarily, knowingly, or intelligently and because his confessions were coerced and involuntary. The State notes that this issue was addressed by this court on direct appeal and, therefore, has previously been determined. We agree with the State.

Tennessee Code Annotated section 40-30-106(h) states:

A ground for relief is previously determined if a court of competent jurisdiction has ruled on the merits after a full and fair hearing. A full and fair hearing has occurred where the petitioner is afforded the opportunity to call witnesses and otherwise present evidence, regardless of whether the petitioner actually introduced any evidence.

Here, the Petitioner filed a pre-trial motion to suppress his confessions on the grounds that his statements were not freely and voluntarily given and that he did not knowingly, intelligently, or voluntarily waive his Miranda rights, and the trial court held a hearing on that motion. Jason Curtis Johnson, 2006 WL 407767, at *7-8. On appeal, this court concluded that "the evidence does not preponderate against the trial court's finding that [the Petitioner] voluntarily and knowingly waived his rights against self-incrimination and voluntarily gave his statements concerning the killing of the victims." Id. at *9. Accordingly, this issue has been previously determined, and the Petitioner is not entitled to relief.

*Denial of Sixth Amendment Right to Counsel During Police Interview*

The Petitioner claims that his Sixth Amendment right to counsel was violated because his right to counsel had attached prior to his interview with police. The State argues that the Petitioner could have presented this issue on direct appeal and, consequently, it is waived. We agree with the State.

Tennessee Code Annotated section 40-30-106(g) states:

A ground for relief is waived if the petitioner personally or through an attorney failed to present it for determination in any proceeding before a court of competent jurisdiction in which the ground could have been presented unless:

(1) The claim for relief is based upon a constitutional right not recognized as existing at the time of trial if either the federal or state constitution required retroactive application of that right; or

(2) The failure to present the ground was the result of state action in violation of the federal or state constitution.

In this case, the Petitioner did not raise this issue on direct appeal. The Sixth Amendment right to counsel existed at the time of the 2003 trial. Additionally, the Petitioner has not presented any evidence that his failure to present his claim was the result of state action. Accordingly, the Petitioner has waived this issue for review in post-conviction proceedings.

*Tennessee's "Unconstitutional" Sentencing Scheme*

The Petitioner argues that his Sixth Amendment rights were violated when the trial court sentenced him to twenty-five years' imprisonment for his second degree murder conviction under "Tennessee's unconstitutional sentencing scheme." The Petitioner asserts that the trial court imposed the twenty-five-year sentence after making factual findings about enhancement factors that were not submitted to the jury in violation of Blakely v. Washington, 542 U.S. 296 (2004), Cunningham v. California, 549 U.S. 270 (2007), and State v. Gomez, 239 S.W.3d 733 (Tenn. 2007) ("Gomez II"). The Petitioner also contends that this court should apply the Blakely and progeny analysis retroactively as it did in State v. H.R. Hester, No. E2006-01904-CCA-R3-DD, 2009 WL 275760, at *41-44 (Tenn. Crim. App. Feb. 5, 2009), aff'd and remanded, State v. Hester, 324 S.W.3d 1, 13 (Tenn. 2010).

Despite the Petitioner's assertion to the contrary, H.R. Hester does not stand for the proposition that the Petitioner is entitled to retroactive relief on his Blakely claim in this post-conviction proceeding. The defendant in H.R. Hester raised the Blakely issue during a direct appeal from his conviction and death sentence. Id. at *1. Conversely, this court "has repeatedly held that Blakely, Cunningham, and Gomez II did not establish a new rule of constitutional law which was entitled to retroactive application on collateral review as it was only a clarification of the rule announced in Apprendi [v. New Jersey], 530 U.S. 466 [(2000)]." Stanley Blue v. State, No. W2011-01936-CCA-R3-PC, 2012 WL 3362270, at *12 (Tenn. Crim. App. Aug. 15, 2015); see also Glen Cook v. State, No W2006-01514-CCA-R3-PC, 2008 WL 821532, at *10 (Tenn. Crim. App. Mar. 27, 2008), perm. app. denied (Tenn. Sept. 29, 2008); Carl Johnson v. State, No. W2003-02760-CCA-R3-PC, 2005 WL 181699, at *4 (Tenn. Crim. App. Jan. 25, 2005), perm. app. denied (Tenn. June 27, 2005). Accordingly, the Petitioner may not raise a free-standing Blakely claim in order to collaterally attack his sentence during post-conviction proceedings. See Stanley Blue, 2012 WL 3362270, at *12. The Petitioner is not entitled to relief.

## Conclusion

For the aforementioned reasons, the judgment of the post-conviction court is affirmed.

_____
ROBERT L. HOLLOWAY, JR., JUDGE